UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SANDRA D. BELL,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )        Case No. 4:10CV00313 AGF
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
            Defendant.             )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Sandra D. Bell was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1381(f). For the reasons set forth below, the decision of the Commissioner shall be reversed and this case shall be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

Plaintiff, who was born on November 22, 1971, applied for disability benefits on January 9, 2007, and for SSI on January 17, 2007. Plaintiff alleged a disability onset date of January 5, 2007, at age 35, due to a blood clot in her lung, high blood pressure, Bell's Palsy and anemia. After Plaintiff's application was denied at the initial administrative level, she requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on April 23, 2008, at which Plaintiff and a vocational expert ("VE")

testified.  In a decision dated May 28, 2008, the ALJ found that Plaintiff could not perform her past relevant work, but that given her age, experience, and residual functional capacity ("RFC"), Plaintiff could perform sedentary work with limitations; therefore, she was not disabled under the Act.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on December 31, 2009.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff argues that (1) the ALJ's RFC determination failed to give appropriate weight to limitations indicated by Plaintiff's treating physician and (2) the ALJ relied on testimony by the VE that assumed hypothetical limitations inconsistent with those actually found by the ALJ.  Plaintiff requests that the case be remanded to the Commissioner with instructions to pay Plaintiff benefits, or alternatively, for a new determination.

## BACKGROUND

### Work History and Application Forms

Plaintiff reported that she most recently worked as a clerk for a temporary agency from April 2004 to January 2007.  In this position, she worked 40 hours per week, earning $8 per hour, sitting and handling small objects for four to eight hours per day. Earnings records indicate that Plaintiff earned approximately $8,000 in 2003, $2,000 in 2004, $6,000 in 2005, and $3,000 in 2006.  Plaintiff reported that, prior to the temp agency, she worked for a photo lab from November 1994 to February 2003, where she

worked 40 hours per week, earning $12.10 per hour.  This work involved sorting and carrying boxes of film, requiring her to walk and stand for two hours per day, sit and handle small objects for six to eight hours per day, and lift ten pounds frequently.  The record indicates that Plaintiff earned approximately $3,000 in 1994 and $12,000 in 1995, and that her earnings steadily increased to $24,000 in 2002.  Prior to working at the photo lab, Plaintiff worked as a cashier from June 1993 to December 1993, working 30 to 40 hours per week, and earning $7.00 per hour.  She described this work as requiring walking, standing, and handling big objects for four to eight hours per day, and lifting ten pounds frequently.  Despite Plaintiff's report, earnings records indicate that Plaintiff did not earn income in 1993. (Tr. 109-10; 127-31.)

**Medical History**

On January 5, 2007, Plaintiff visited the emergency room, complaining of the sudden onset of pain on her left side and difficulty breathing.  Plaintiff also reported that she had been experiencing swelling in her right leg since December 31, 2006, but had assumed it was a muscle spasm.  Her home medications included Lisinopril[1] and Triamterene/Hydrochlorothiazide ("HCTZ"),[2] and she had a history of hypertension, anemia, and gastroesophageal reflux disease ("GERD").  She was admitted to the hospital

---

[1]  Lisinopril is used to treat high blood pressure (hypertension) and congestive heart failure, and to improve survival after a heart attack.  See *Lisinopril* at http://www.drugs.com/ lisinopril.html.

[2] The combination of hydrochlorothiazide and triamterene is used to treat fluid retention (edema) and high blood pressure.  See *What is Hydrochlorothiazide and Triamterene?* at http://www.drugs.com/mtm/ hydrochlorothiazide-and-triamterene.html.

and diagnosed with a left lower lobe pulmonary embolism, hypertension, anemia, and GERD, and received a peripherally inserted central venous catheter.  Plaintiff was discharged on January 9, 2007.  At discharge, Dr. Richard E. Ostlund noted that Plaintiff's left lower lobe pulmonary embolism was most likely secondary to her morbid obesity, as well as her oral contraceptive use.  He prescribed Lovenox (a blood thinner) in order to transition Plaintiff to Coumadin,[3] and discontinued her oral contraception.  Plaintiff's other discharge medications included iron supplements, HCTZ, Prevacid, and Lisinopril.  Plaintiff was discharged with Home Health and was given oxygen for use at home to help with her difficulty breathing.  He set a schedule for checking Plaintiff's international normalized ratio ("INR")[4] and instructed Plaintiff to resume daily activities as tolerated, resume a low fat diet, and to follow up with Dr. Stacy Banerjee at the clinic on January 30, 2007.  (Tr. 164-201.)

On January 29, 2007, Plaintiff completed a Function Report in connection with her application for benefits.  Plaintiff reported that she lived with her seven-year-old son in an apartment.  She reported that on a typical day she got her son ready for school, and would then rest until dinner due to shortness of breath.  She generally prepared sandwiches or frozen meals for herself and her son.  She could dress, bathe, and feed

---

[3] Coumadin (warfarin) is an anticoagulant (blood thinner). Coumadin reduces the formation of blood clots by blocking the formation of certain clotting factors.  See *What is Coumadin?* at http://www.drugs.com/coumadin.html.

[4] The international normalized ratio is a system established by the World Health Organization (WHO) and the International Committee on Thrombosis and Hemostasis for reporting the results of blood coagulation (clotting) tests.  See *Definition of INR* at http://www.medterms.com/script/main/art.asp?articlekey=9185.

herself, and go to the restroom by herself, but needed her oxygen tank to do so. She could clean the apartment, with her oxygen, but it took her a long time and she usually needed help. She experienced pain and shortness of breath when sleeping, and would sit up to get air. She needed help with taking her shots, and could not go out alone because she would get short of breath and needed her oxygen. She also required assistance when shopping and going to the doctor. Plaintiff did not have any hobbies and did not go places on a regular basis. Plaintiff reported that she had trouble lifting, bending, standing, walking, sitting, talking, and climbing stairs, due to her shortness of breath and back pain. She stated that she could not walk far without her oxygen, and would need to rest for approximately 30 minutes and use her oxygen tank before she could resume walking. She also noted that she did not handle stress well due to her Bell's Palsy, and was afraid because of her Bell's Palsy and blood clots. (Tr. 132-39.)

On January 30, 2007, Plaintiff followed up on her hospital visit at the clinic with Dr. Banerjee. Plaintiff reported no recurrent symptoms of shortness of breath or leg pain, but she did complain of lower back pain with prolonged sitting. Plaintiff reported that she was more active at home since starting on oxygen, and she did not need the oxygen when resting. Plaintiff also reported losing nine pounds by cutting down portion sizes. Dr. Banerjee referred Plaintiff to an obstetrician/gynecologist for counseling on non-hormonal birth control options, counseled Plaintiff regarding healthy eating habits, and encouraged her to exercise to tone her upper extremities. Dr. Banerjee also increased Plaintiff's Coumadin and HCTZ dosages, and continued Plaintiff on iron supplements. (Tr. 203-05.)

On February 24, 2007, Plaintiff's aunt completed a Third-Party Function Report on Plaintiff. Plaintiff's aunt reported that Plaintiff required help with getting her son ready for school and preparing meals. She reported that Plaintiff experienced difficulty with shortness of breath and needed to use her oxygen tank. She also stated that Plaintiff had to rest every five minutes, could not walk more than a short distance, and always had to carry her oxygen tank with her. Additionally, Plaintiff could no longer cook with her stove or oven because of her oxygen. She stated that Plaintiff tried to visit her mother as much as she could, got along with family, friends and neighbors, and handled stress very well. (Tr. 140-48.)

On February 28, 2007, Plaintiff visited the clinic for a routine visit. Plaintiff was on two liters of oxygen per minute and was being followed by Home Health. Plaintiff's chief complaint was her need for help with purchasing her Coumadin prescription. A social worker at the clinic provided Plaintiff with samples and enrolled her in an assistance program. Sajama Wagar, M.D., noted that Plaintiff was doing well at home, taking her Coumadin, and getting her INR checked by the home nurse. Dr. Wagar continued Plaintiff's prescription for Coumadin, ferrous sulfate, home oxygen, HCTZ, and Lisonopril. (Tr. 246-56.)

On March 28, 2007, Plaintiff visited the clinic. Dr. Banerjee noted that Plaintiff reported that she was trying to be more active and had achieved a ten pound weight loss, and she encouraged Plaintiff to continue diet and lifestyle changes. (Tr. 240-45.)

On May 2, 2007, Plaintiff visited the clinic for a follow-up visit and complained of new back pain. Plaintiff reported that she was experiencing no new symptoms with

regards to her pulmonary embolism and was less dependent on home oxygen. Dr. Banerjee continued Plaintiff's anticoagulation treatment, noted that Plaintiff had lost a significant amount of weight since her January hospital admission, and encouraged Plaintiff to remain active and follow a healthy diet. (Tr. 236-39.)

On July 17, 2007, Plaintiff visited the clinic to follow up on her back pain. Plaintiff complained of facial pain, which was consistent with her history of Bell's Palsy, but reported that it was usually partially relieved by Tylenol. Plaintiff also reported that she was able to walk at times without her oxygen, but walking outdoors made her feel short of breath due to the heat. Dr. Banerjee referred Plaintiff to physical therapy for an evaluation of her back pain, started her on Amitryptiline for her Bell's Palsy, and continued her anticoagulation treatment, with the intent of discontinuing it at her next appointment. Plaintiff reported no new symptoms related to her pulmonary embolism and reported decreased dependence on home oxygen. Plaintiff had also lost a significant amount of weight, and Dr. Banerjee encouraged her to remain active. (Tr. 213-18.)

Also on July 17, 2007, Dr. Banerjee completed a Medical Source Statement ("MSS") of Ability to Do Work-Related Activities (Physical). Dr. Banerjee stated that Plaintiff was limited to lifting or carrying 15 pounds, because lifting or carrying while on Coumadin increased her risk of bleeding, and limited to three hours of standing and one hour of walking in an eight-hour workday, due to Plaintiff's increased shortness of breath. Dr. Banerjee stated that, without interruption, Plaintiff could only stand for one hour or walk for five minutes, and that Plaintiff could sit for a total of six hours in an eight-hour workday, and for two uninterrupted hours at a time. Dr. Banerjee noted that

Plaintiff's feet should be elevated while Plaintiff was seated, and that Plaintiff could not get through an eight-hour workday (with normal breaks) on a sustained basis without lying down during the workday. The MSS noted that Plaintiff should never climb, balance, or crawl, and only occasionally stoop, crouch, or kneel; was limited in pushing and pulling; should restrict her exposure to heights and moving machinery due to her increased risk of bleeding; should restrict her exposure to extreme temperatures due to her increased risk of blood clots; should limit her exposure to chemicals and dust due to her increased risk of blood clots and shortness of breath; and should restrict her exposure to fumes and humidity due to her increased risk of shortness of breath and her oxygen requirements. Dr. Banerjee noted that these limitations commenced in January 2007 and were expected to continue indefinitely. (Tr. 335-38, 267-70.)

On September 19, 2007, Plaintiff visited the emergency room, reporting several days of dizziness with one "falling out" episode during which she believed she momentarily lost consciousness. Plaintiff stated that the dizziness almost always occurred when she stood from a lying or seated position. After reviewing Plaintiff's lab results, medical history, and medications, Mark D. Levine, M.D., diagnosed Plaintiff with hypotension. Because Plaintiff was unwilling to be admitted overnight, Dr. Levine discharged Plaintiff with orders that she should follow up with her primary care physician the next day. (Tr. 317-30.)

On September 21, 2007, Plaintiff was re-admitted to the emergency room after presenting to the clinic following an acute episode of syncope. Plaintiff's white blood count was elevated. Plaintiff was treated with IV fluid and her antihypertensives were

adjusted.  Plaintiff was started on HCTZ and fluconazole, in addition to her outpatient regimen of Lisinopril.  Plaintiff's chest x-ray was clear, her CT scan revealed no evidence of pulmonary emboli, and Plaintiff experienced no recurrence of syncope.  She was discharged the following day, with a diagnosis of hypotension and syncope.  (Tr. 258-64; 302-16.)

In a clinic follow-up on October 1, 2007, Plaintiff stated she had not had any more syncopal episodes, but continued to have intermittent lightheadedness.  She reported no shortness of breath, and stated that she had not required any more oxygen since her hospital discharge, and she could move about comfortably without it.  Dr. Banerjee discontinued Plaintiff's HCTZ prescription due to Plaintiff's "continued episodes," which Dr. Banerjee attributed to Plaintiff's orthostatic hypotension.  A chest CT revealed no pulmonary embolism, but the radiologist noted a peripheral rounded nodular opacity in the inferior lingual.  Given Plaintiff's history of pulmonary embolism, the radiologist noted that "this may represent a region of prior infarct."  Dr. Banerjee also ordered an echocardiogram to rule out valvular abnormalities, and an event monitor to rule out arrhythmia.  (Tr. 294-99.)

An echocardiogram on October 12, 2007, showed that both the left and right ventricles were normal in size, and in systolic and diastolic function.  A saline contrast study was positive "for right to left shunt with Valsalva maneuver c/w PFO."  Mild "MR and TR" were noted and the visualized portion of aortic arch appeared normal.  (Tr. 291-93.)

At a follow-up clinic visit on October 15, 2007, Plaintiff reported that, since being

taken off HCTZ, she no longer had lightheadedness.  She had not experienced chest pains, palpitation, shortness of breath, or syncopal episodes.  Brian Gage, M.D., noted that Plaintiff's echocardiogram did not have valvular abnormalities.  He continued her Warfarin prescription for her pulmonary embolism.  (Tr. 286-90.)

On November 16, 2007, Plaintiff returned for another follow-up at the clinic.  She reported an intermittent headache that was short lived and easily relieved with over the counter Tylenol, and that she had not experienced further episodes of dizziness or syncope since discontinuing HCTZ.  Dr. Banerjee continued Plaintiff on anticoagulation treatment for a total of 12 months of therapy, and instructed Plaintiff to continue her iron supplements.  (Tr. 279-85.)

On March 17, 2008, Dr. Banerjee reviewed the July 17, 2007 MSS, and noted that, based upon an examination of Plaintiff, no changes need be made to the limitations set out in July.  (Tr. 266.)

**Evidentiary Hearing of April 23, 2008 (Tr. 19-52)**

Plaintiff, who was represented by counsel, testified that she was 36 years old, single, and lived at home with her eight-year-old son.  They lived in a duplex which required her to climb steps to enter the duplex or access the basement.  Plaintiff testified that she did not drive and did not have a driver's license.  Her current income source was her son's disability checks, and she also received $298 per month in food stamps.  Plaintiff testified that she had a high school diploma and attended some vocational training, but did not complete the program.

Plaintiff testified that she had last worked on January 5, 2007. She had served as a clerical clerk, processing checks and vouchers. Plaintiff stated that she stopped working following her blood clot, and never returned after her sick leave because her doctor told her she could not return to work after she had her blood clot. Plaintiff testified that she worked at a photo development company from 1994 to 2003, before it went out of business. At that job, she prepared boxes of film weighing approximately 25 to 30 pounds to be shipped. Since January 5, 2007, she had not put in any applications for less strenuous work because her doctor had not yet released her to do so.

Plaintiff described her daily activities essentially consistent with her January 29, 2007 Function Report. Plaintiff stated that she needed to take breaks when doing chores and could only exert herself for around 15 minutes before needing a 20 to 30 minute break. Plaintiff stated that her routine did not vary on the weekends, unless she was visiting her mother's house, in which case a family member would drive her over.

Plaintiff testified she could only cook "easy things," and that generally her mother prepared meals that she could microwave. She did not do laundry because she lacked the ability to go down the stairs, but folded the laundry and put it away. She washed dishes, made the bed, and was able to vacuum, mop, and sweep, if she used the oxygen unit. She could go grocery shopping if her mother helped her. She did not cut her grass or garden.

Plaintiff testified that she had high blood pressure since age nine and had taken medicine since age 13. At the time of the hearing, she was on two different medications for blood pressure, Lisinopril and HCTZ. She stated that her blood pressure was under control, but her medications were recently changed. She testified that she took iron

because she had been anemic since she was a child, and took Coumadin as a blood thinner. She also took Tylenol for intermittent pain in her face, back, and legs. The pain in her face was due to Bell's Palsy, which could not be treated. She did not know the cause of the pain in her back and legs, though x-rays were taken. Lastly, she took Amitriptyline once a day, which controlled the pain "sometimes."

Plaintiff stated that she had shortness of breath and chest pains, usually brought on by walking or activity. She was not on medication for the chest pain. She had a blood clot in her leg and her lung on January 5, 2007, and was given Coumadin, and "some shots" to dissolve them; Plaintiff wasn't sure if the clots were gone. She testified that she had "a hole in her chest," but her doctor had not mentioned surgery to fix it. Plaintiff also mentioned that she had suffered fainting spells several months earlier, but they had stopped. Other than the fainting spells, she testified that she was tolerating her medicines "okay." "[B]esides a little depression," she was mentally stable; she had never been in a mental hospital and was not under the care of a psychiatrist.

Plaintiff stated that, because of her back pain, she could not sit for more than two or three hours. However, she had no problem standing up as long as she did not move around, and could "probably" lift 15 pounds. She stated that she did not know how far she could walk without her oxygen tank. Despite her doctor's advice that she should not climb steps, Plaintiff testified that she climbed steps to get into her house, with the assistance of a railing. Regarding Dr. Banerjee's statement about exposure to air irritants, Plaintiff stated that she had not paid attention to whether gasses, fumes, chemicals, dust, or humidity bothered her, but opined that maybe Dr. Banerjee did not want her exposed

to them "because [of] the oxygen." She "sometimes" had problems with balance, and had trouble with postural things, such as bending, stooping, or crawling; if something fell to the floor, Plaintiff called her son to retrieve it. She also stated that she did not sleep well at night, probably due to her breathing.

The VE testified, first noting that the region to which he referred was the Saint Louis, Missouri region, the State of Missouri, and the State of Illinois. The VE reviewed Plaintiff's work history, beginning with her position as a photo negative write-up person, which was performed in the national economy at the light level with a specific vocational preparation ("SVP") level of 6. He noted that Plaintiff had stated on two different occasions that she performed it at the light level, but testified that she performed it at the medium level. Plaintiff's work as a cashier was classified as light level with an SVP level of 2 in the national economy, and her temporary clerical position, which she stated she performed at the light level, was classified as sedentary[5] with an SVP level of 6 in the national economy.

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past work experience, who was limited to performing sedentary work, who could lift, carry, push, or pull 20 pounds occasionally, and 10 pounds frequently, sit for six out of eight hours, and stand or walk each for two out of eight hours, for a total of

---

[5] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; sitting for about six hours and standing for up to about two hours in an eight-hour workday. 20 C.F.R. § 404.1567(a); Social Security Ruling 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

eight hours; and could occasionally climb, balance, stoop, crouch, kneel, or crawl, but should have no exposure to ladders, ropes, scaffolds, moving machinery, or unprotected heights, and no concentrated exposure to dust, fumes, gasses, chemicals, and humidity. The VE testified such an individal could not perform any of Plaintiff's past relevant work, but could perform jobs such as a loader semi-conductor of dyes or assembly line fabricator. The VE testified that each of these jobs was sedentary and available in significant numbers in the relevant regions. Although the record is somewhat confused with regard to this issue, it appears the VE further testified that using an oxygen tank would not be an impediment to the work process in either of these jobs. He also testified that such an individual would have no transferable work skills at the sedentary level.

In response to questioning by counsel, the VE testified that if the person in the above hypothetical were required to elevate her legs while seated and unable to get through an eight hour day on a sustained basis, that person would be unemployable because she would need an extra break or other accommodations that most employers would be unwilling to provide.

## ALJ's Decision of May 28, 2008 (Tr. 11-18)

The ALJ found that Plaintiff met the special earnings requirements of the Act as of January 5, 2007, the alleged onset of disability, and continued to meet them through the date of the decision. He then found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. He found that Plaintiff suffered from the following severe impairments: obesity, status-post pulmonary embolism, deep vein thrombosis, hypertension, iron deficiency anemia, Bell's Palsy, and GERD controlled by medication.

14

However, the ALJ found that none of these impairments, singly or in combination, met or equaled a deemed-disabling impairment listed in the Commissioner's regulations.

The ALJ proceeded to find that Plaintiff possessed the RFC to perform the full range of sedentary work, but that Plaintiff must avoid prolonged or frequent standing or walking, and lifting or carrying objects weighing more than ten pounds. Plaintiff also could not climb ropes, ladders or scaffolds; climb ramps and stairs on more than an occasional basis; and could not balance, stoop, kneel, crouch, or crawl. Plaintiff also should avoid concentrated exposure to unprotected heights or dangerous moving machinery, or to dust, fumes, chemicals, temperature extremes, high humidity, or dampness, and other typical allergens, pollutants, and atmospheric irritants.

Citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), the ALJ found the preponderance of the medical and other evidence to be inconsistent with Plaintiff's allegation of disability. The ALJ found that Plaintiff had a steady work record up to her alleged onset of disability, but noted that a claimant's work record was only one factor considered when assessing credibility. The ALJ stated that there was no evidence that Plaintiff's obesity reduced her overall functional abilities any further than the RFC he had assessed. Plaintiff had not experienced any recurrences of deep vein thrombosis or pulmonary embolism. Moreover, Plaintiff's chronic conditions were stable with medication. The ALJ also noted that Plaintiff was never told she could not work; in fact, she was told to exercise to increase her strength and stamina. The ALJ considered the MSS completed by Dr. Banerjee, and combined with the VE's testimony, determined that

Plaintiff could not perform her past relevant work, but was able to perform sedentary work with limitations.

The ALJ noted that the VE's testimony, when given a hypothetical even more restrictive than the limitations imposed by Dr. Banerjee, indicated that Plaintiff could perform any of a total of about 1,000 jobs in the St. Louis area and about 5,000 jobs in the State of Missouri. Additionally, while the VE testified that Plaintiff would be unemployable if she had to use her oxygen tank continuously[6] or elevate her legs several times during a working day, the ALJ noted that he did not find either of these assumptions to be valid or justified by the preponderance of the medical evidence and opinions in the record. The ALJ determined that Plaintiff's allegations of her impairments, either singly or in combination, were not credible to the extent they alleged symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity. The ALJ also found the allegations of Plaintiff's aunt lacked credibility, and found her statements were not proof of disability, as she was not medically trained. The ALJ also concluded that the aunt's statements about Plaintiff's limitations were inconsistent with the opinions and observations by qualified medical personnel, though the ALJ did not identify the opinions to which he was referring.

The ALJ found that there was a significant number of jobs in the local and national economy which Plaintiff could perform. Therefore, the ALJ found that Plaintiff was not

---

[6] The VE was actually asked whether Plaintiff could perform these jobs if she were required to elevate her legs and unable to get through an eight-hour day on a sustained basis.

disabled as defined by the Social Security Act.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court "must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Barnhart v. Walton</u>,  535 U.S. 212, 217-22 (2002).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If so, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any.  If the claimant can return to past relevant work, the claimant is not disabled.  If not, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

Where, as here, a claimant cannot perform the full range of work in a particular category of work (heavy, medium, light, and sedentary), the Commissioner must consider

testimony of a VE as to the availability of jobs that a person with the claimant's profile could perform. <u>Baker v. Barnhart</u>, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

## The Weight to be Given to the Treating Physician

Plaintiff argues that the ALJ erred in making his RFC determination, by failing to include certain limitations provided in Dr. Banerjee's July 17, 2007 MSS. The Plaintiff alleges that the ALJ erred in thereafter concluding that Plaintiff could perform other work.

As described above, the ALJ substantially adopted Dr. Banerjee's limitations regarding Plaintiff's ability to stand, walk, lift, and carry in his RFC determination. (Tr. 17.) The ALJ did not include Dr. Banerjee's limitations on Plaintiff's need to elevate her feet and lie down during the day. In his decision, the ALJ stated that he did not find these assumptions to be valid or justified by the preponderance of the medical evidence and opinions in the record. (Tr. 15.)

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>Id.</u> at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC.  Id.  As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'"  Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 7, 711 (8th Cir. 2001).  The ALJ is therefore required to consider at least some supporting evidence from a medical professional.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The record indicates that Dr. Banerjee was Plaintiff's treating physician from January 2007 through at least March 2008.  (Tr. 203-05, 266.)  The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area.  20 C.F.R. § 404.1527(d).  The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id. § 404.1527(d)(2); Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009).  However, "[a] treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objected medical evidence in the record."  Cain v. Barnhart, 197 F. App'x. 531, 533-34 (8th Cir. 2006).

In this record, there is a basis for the ALJ to discount or disregard the MSS to the extent Dr. Banerjee determined Plaintiff needed to elevate her feet and lie down during the day, see Tr. 336, as Dr. Banerjee did not provide any medical support for this finding. Plaintiff attempts to link these limitations to Plaintiff's risk of bleeding due to her Coumadin prescription, but a review of Dr. Banerjee's MSS reveals that Dr. Banerjee only expressed concern for Coumadin's side effects with respect to environmental restrictions and lifting/carrying restrictions. (Tr. 335, 337.) Moreover, the medical records indicate that since January 30, 2007, Plaintiff's chronic impairments, including her pulmonary embolism, deep vein thrombosis, hypertension, GERD, iron deficiency anemia, and Bell's palsy, were all controlled with medication, see Tr. 203-05, 213-18, 236-39, 246-56, 279-90, 294-99, and Dr. Banerjee, and other treating sources, also encouraged Plaintiff to resume her daily activities and to exercise. (Tr. 183, 204.) Nor does the record contain any treatment notes by Dr. Banerjee containing these restrictions.

While there is, therefore, a record support for the ALJ to discredit the basis of these two restrictions, the fact remains that the ALJ had no medical basis for determining Plaintiff was, in fact, capable of working a full eight-hour day without laying down or elevating her feet. "Some medical evidence is necessary to support the ALJ's determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (internal quotations omitted). Here, the ALJ improperly substituted his own lay opinion for the opinions of treating or examining professionals. See id. at 703; Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000) ("[a]n administrative law

judge may not draw upon his own inferences from medical reports"); <u>Landess v. Weinberger</u>, 490 F.2d 1187, 1189 (8th Cir. 1974) (same).

Under the circumstances, it was reversible error for the ALJ to substitute his own conclusions for those of plaintiff's physician.  See <u>DiMasse</u>, 2004 WL 133928. *3 (8th Cir.  Jan. 22, 2004); <u>Shontos</u>, 328 F.3d at 427; <u>Pratt v. Sullivan</u>, 956 F.2d 830, 834 (8th Cir. 1992) (per curiam).

**<u>The VE Testimony</u>**

Additionally, the Court finds that the ALJ erred in relying on the VE's testimony because the ALJ's hypothetical question to the VE was inconsistent with the limitations actually found by the ALJ.  The ALJ asked the VE to assume that the hypothetical individual "can lift, carry, push, pull 20 pounds occasionally, 10 pounds frequently . . . ," and the VE's subsequent opinions were based on those hypothetical restrictions.  (Tr. 49.) However, the ALJ determined that Plaintiff had the RFC "to perform exertional and nonexertional requirements of work except for . . . lifting or carrying objects weighing more than 10 pounds . . . ."  (Tr. 17.)  And, there is no medical evidence in the record to support a finding that Plaintiff could "lift, carry, push, pull 20 pounds."

## <u>CONCLUSION</u>

The Court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4, consistent with this Opinion.

Accordingly,

**IT IS HEREBY ORDERED** that this case is **REVERSED** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order**.**


*Audrey G. Fleissig*
_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2011.